IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:09-CT-3070-BO

BRIAN A. CULPEPPER, )
    Plaintiff, )
)
v. ) **ORDER**
)
NORTH CAROLINA DEPT. OF )
CORRECTION, et al., )
    Defendants. )

Brian A. Culpepper filed this action pursuant to 42 U.S.C. § 1983. He alleges deliberate indifference to his serious medical conditions. Dr. Richard Broadwell, as the sole remaining defendant, is properly before this court with a motion for summary judgment. Plaintiff Culpepper has responded, and the matter is ripe for determination.

i. Factual Background

The medical records and affidavits before the court are detailed and extensive. (See D.E. # 30, Affidavit of Dr. Dr. Braodwell with attachments 1 - 15, transfer record and medical record, exhibits B - O) From the record the following details are found as fact by the court. Defendant Broadwell became involved in inmate Culpepper's care while Culpepper was housed at Craven Correctional Institution ("CCI") from January 6, 2009, through January 29, 2009, and at Duplin Correctional Center ("DCC") from January 29, 2009, through April 30, 2009. Thereafter, Culpepper was transferred to Pender Correctional Institution ("PCI"). Dr. Broadwell has not treated Culpepper since his transfer to PCI on April 30, 2009.

Immediately prior to Defendant Broadwell's treatment of Culpepper, he had been under the care of James Engleman, M.D. (hereinafter "Dr. Engleman") at CCI. He reported to CCI on January 6, 2009. Prior to this treatment, Culpepper was housed at Central Prison ("CP") as a

safekeeper from June 10, 2007 through September 11, 2008. Inmates housed in jails are transferred to the NCDOC as safekeepers when their medical conditions require more treatment or more specialized treatment than is normally available in a jail setting.

As indicated in Dr. Engleman's January 7, 2009 progress note, Dr. Engleman noted "Culpepper suffered from end stage liver disease, positive Hepatitis C and alcohol history (with positive alcohol history as it was reported that his last drink was 2 days prior) and gastrointestinal (GI) bleed." Dr. Engleman noted that Culpepper had chronic back pain issues, ambulated with a cane and/or walker, had no outside primary care physician, but frequent hospitalizations. Extensive lab work-ups were ordered and prescriptions were ordered.

On January 15, 2009, Dr. Engleman prescribed numerous other medications for pain and other conditions. Culpepper was seen on January 17, 2009, at Craven Regional Medical Center for "an episode of right upper quadrant pain." The GI and general surgery doctor did not recommended any further treatment. Discharge medications were ordered and the summary noted Culpepper was to have no alcohol if he "wanted to live, and to stop smoking. . ." On January 18, 2009, Dr. Broadwell authorized the continuation of three separate orders for medication as a result of Dr. Kent's discharge instructions from Craven Regional Medical Center.

On January 29, 2009, Culpepper was transfer to DCC with the medications prescribed by Dr. Engleman. On February 10, 2009, Culpepper was seen at the medical clinic in response to a sick call request placed February 8, 2009. Nurse M. Moore, LPN, saw plaintiff, prescribed a course of treatment, and referred him to the next available appointment with the unit provider. On February 12, 2009, Dr. Broadwell reviewed Culpepper's medical chart and ordered medical

2

tests to be conducted. He also requested nursing staff to obtain plaintiff's prior medical records from a physician in Morehead City, North Carolina.

On February 13, 2009, S. Franklin, R.N., documented Culpepper's arrival to medical (at approximately 16:20) via wheelchair with complaints of severe left upper quadrant pain and mid-abdominal pain. Culpepper complained of nausea and dizziness. He could not stand due to the pain. Nurse Franklin's assessment was "an alteration in comfort related to pain and her plan was to review Culpepper's's medical chart." Defendant Broadwell was notified by phone of Culpepper's condition and past history of positive Hepititis C, end stage liver disease, cirrhosis, ascitics, varicle bleed, chronic low back pain and polysubstance dependance. An anti-inflammatory injection and injection for nausea and vomiting were prescribed by Dr. Broadwell. Dr. Broadwell also ordered Culpepper's placement on the list to be seen at the next available sick call appointment. Approximately 2 hours later (18:33) a dorm officer called the medical clinic stating that Culpepper was "crying and shaking all over on his bed complaining of pain." He was brought back to the medical clinic in a wheelchair pursuant to Nurse Franklin's instruction (18:38). He was placed on a stretcher and his vital signs were taken and within normal limits (18:41). He complained of pain and rated it at 10 on a scale of 1 to 10. At approximately 19:08 and 19:42, vital signs were taken. Dr. Broadwell was notified of Culpepper's return and ordered another anti-inflammatory injection and injection for nausea and vomiting. At 19:54, Culpepper stated his pain level had improved and was a "7 - 8" on the pain scale. He was able to sit up and stated he was hungry. His vital signs were taken again and were still within the normal limits. He was instructed to drink plenty of fluids and return to medical if his symptoms worsened.

3

On February 16, 2009, Dr. Broadwell reviewed Culpepper's medical chart and the lab results ordered February 12, 2009. The lab work-up was ordered to be repeated and medication was prescribed. The importance of the prescribed medication and not missing its distribution was also explained to Culpepper by Nurse Barnett.[1]

On February 18, 2009, Culpepper submitted a sick call request and was seen at Duplin medical clinic on February 20, 2009. He was seen by Nurse Barnett. Culpepper expressed dissatisfaction with the facility and stated he would not take one of his medications "except when I need it." He complained constantly throughout the sick call appointment interview. He rated his back pain a "6" and abdomen pain a "7." Nurse Barnett again counseled him on the importance of taking his medication. She noted his vital signs. Culpepper refused to sign a DC-442 (Refusal of health care) form, was advised to return to medical clinic as necessary and left the medical clinic mumbling and speaking in a low voice. He was placed on the doctor's list to the next available appointment. On February 21, 2009 he returned to Duplin medical clinic stating he was bleeding. Nurse Chestnutt, in the presence of an officer, checked Culpepper for rectal bleeding, and was told there was none. Culpepper left without having his vital signs taken, refusing to stay.

On March 9, 2009, Culpepper returned to medical clinic for the follow-up lab work ordered by Dr. Broadwell on February 16, 2009. On March 16, 2009, Dr. Broadwell reviewed Culpepper's medical chart and initialed the lab results. On March 18, 2009, Dr. Broadwell examined Culpepper at Duplin medical clinic in response to a request from C. Bean, D.D.S., for a dental evaluation following a planned extraction analgesic. Dr. Broadwell documented that

---

[1]Culpepper had missed 10 of the last 12 doses of the prescribed medication, Ultram.

4

Case 5:09-ct-03070-BO   Document 39   Filed 08/17/10   Page 4 of 10

Culpepper had multiple medical issues, but his complaints were limited to the right upper quadrant pain. Culpepper stated the pain in the right upper quadrant had been present since January when he was told he had gallstones. Culpepper stated surgery was recommended, but that there had been no follow-up. The records reflected gallbadder surgery was prohibitive because of "portal hypertension." Dr. Broadwell noted Culpepper stated his teeth were in poor condition and wanted them removed. Culppper stated he stopped drinking alcohol one year prior and was trying to save money for a liver transplant. Dr. Broadwell noted Culpepper appeared older than his age and walked with a cane.

Dr. Broadwell reviewed the following records of Culpepper: 1) Pitt County hospitalization in October, 2008; 2) Craven Regional hospitalization on January 16, 2009; 3) a gallbladder ultrasound of January 17, 2009, with impression of cholelithiasis with no thickening of GB (gallbladder) wall; 4) an abdominal CT scan of January 17, 2009 with impression of cholelithiasis; no wall thickening and no pericholecystic fluid; 5) a hepatobiliary scan of January 17, 2009 which showed no evidence of cystic or common duct obstruction; 6) an abdominal/pelvic CT scan of October 1, 2008 which showed liver nodular with left hepatic lobe (increase) consistent with cirrhosis, splenomegaly, portal hypertension (HTN), cholelithiasis, small right pleural effusion, fracture of the 6th/7th ribs, and right posterior at CVA (costovertebral angle) joint; and 7) an x-ray of the thoracic and lumbar spine on October 1, 2008, with impression of normal. (Broadwell Affidavit, ¶18 and Exhibit L). Dr. Broadwell reviewed and documented current lab results of serum ammonia levels taken on February 13, 2009, and another taken on March 8, 2009, noting that Culpepper refused to take Lactulose medication that had been prescribed for him. (*see* Broadwell Affidavit, ¶14) The levels were considered "high

5

enough to trigger an 'alert' flag on the LapCorp report, but . . . not in the range to produce encephalopathy (brain malfunction caused by poor liver function whose symptoms may include confusion and/or forgetfulness)." Dr. Broadwell reviewed and documented CBC (complete blood count) lab results taken September 4, 2008, and a Hepatitis panel and CMP (complete metabolic panel) taken on January 8, 2009. A "hepatobiliary scan" was undertaken January 17, 2009 which "corroborate[d] that there was no evidence for cystic or common duct obstruction." Dr. Broadwell's assessment was as follows:

> 1) end stage liver disease/cirrhosis, secondary to alcohol abuse; 2) immunologic evidence HCV (Hepatitis C virus) exposure and clearing (no chronic HCV infection); 3) portal hypertension and splenomegaly secondary to cirrhosis; 4) history of recurrent hepatic encephalopathy per CP notes September 9, 2008; 5) thrombocytopenia; 6) minimal coagulopathy$_{21}$ (INR 1.4); 7) cholelithiasis without evidence of chronic choleystitis; 8) 6 month status post fracture of the right 6th and 7th ribs; 9) history of degenerative disc disease lumbar spine; 10) tobacco dependence (controlled on smoke free unit); and 11) history of polysubstance abuse.

(Broadwell Affidavit, ¶18 and Exhibit L). Dr. Broadwell's plan at that time included the following: "1) address those issues which were manageable which included: a) portal hypertension and history of esophageal variceal bleed with H2B (histamine 2 blocking) / B (beta) blockade and b) prophylaxis for encephalopathy, and inmate Culpepper was educated as to the cause; 2) assess and approve for dental if reasonably safe and 3) document the several orders to be carried out." Dr. Broadwell took the following actions: "1) ordered CBC lab work-up with platelets, PT/INR values and partial thromboplastin time; 2) prescribed Tenormin 25 mg (a beta-blocker) to be taken every morning for six months; 3) prescribed Aldactone 25 mg (treats swelling and fluid retention in patients with cirrhosis) to be taken twice daily for six months; 4) prescribed Zantac 150 mg (reduces gastric acidity) to be taken twice daily for six months; 5)

6

discontinued the Ultram which had been previously prescribed by Dr. Engleman (because inmate Culpepper stated it 'does nothing'; 6) prescribed Motrin 600 mg to be taken twice daily as needed for six months with five refills; 7) ordered blood pressure checks to be done every Tuesday and Friday for three months and noted that he would re-review the above ordered labs once the results were available." As to the dental concerns, Dr.Broadwell made specific notation to the dentist, Dr. Bean, that a short term increase in the frequency of Motrin was acceptable for extraction analgesia. (Broadwell Affidavit, ¶18 and Exhibit L).

On March 20, 2009, the March 18, 2009, ordered lab results were received. Dr. Braodwell reviewed Culpepper's medical chart and concluded the labs held that the results did not indicate the tooth extraction should not be undertaken. On April 6, 2009, Dr. Broadwell discontinued the Mortrin and prescribed Percogesic, a different pain reliever. Dr. Broadwell also discussed the results with Dr. Bean, the dentist. On April 13, 2009, Dr. Broadwell reviewed Culpepper's medical charts and ordered a urinalysis and blood work-up to include a CBC and CMP. The labs were completed on April 14 and 15, 2009. Culpepper filed his complaint on Apirl 13, 2009 and on Culpepper was transferred onto PCI on April 30, 2009.

ii. Discussion

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading,

7

Anderson, 477 U.S. at 248, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A mere scintilla of evidence supporting the case is not enough. Anderson, 477 U.S. at 252. The court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in the non-movant's favor. Matsushita Elec. Indus. Co., 475 U.S. at 587. The court can rely on the medical affidavits and prison medical records in ruling on a motion for summary judgment. See generally, Stanley v. Hejirika, 134 F.3d 629, 637-38 (4th Cir. 1998); Marshall v. Odom, 156 F. Supp. 2d 525, 530 (D. Md. 2001); Bennett v. Reed, 534 F. Supp. 83, 86 (E.D.N.C. 1981), aff'd, 676 F.2d 690 (4th Cir. 1982).

Defendant's defense of qualified immunity concludes this matter. Government officials are entitled to qualified immunity from civil damages as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects government officials "where the law is unsettled or murky." Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001). The Fourth Circuit has recognized a two-pronged qualified immunity inquiry. First, the court must "decide whether a constitutional right would have been violated on the facts alleged." Bailey v. Kennedy, 349 F.3d 731, 739 (4th Cir. 2003). Second, assuming the right is violated, "courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." Id. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

8

confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001), receded from by, Pearson v. Callahan, __ U.S.___, 129 S. Ct. 808 (2009). A court has discretion to decide which step in the two-prong test to analyze first. Pearson, 129 S. Ct. at 821.

Deliberate indifference to serious medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.[2] Estelle v. Gamble, 429 U.S. 97, 105-106 (1976). In order to be liable, the official must have actual knowledge or awareness of the need. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). The indifference must be objectively harmful enough to establish a constitutional violation. See id. at 837–40. Disagreement with medical staff over the course of treatment is not sufficient to state an Eighth Amendment deliberate indifference claim. See, e.g., De'Lonta v. Angelone, 330 F.3d 630, 635 (4th Cir. 2003); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam). Likewise, mere negligence in diagnosis or treatment does not state a constitutional claim. Estelle, 429 U.S. at 105–06.

Cullpepper does not allege facts which breach the constitutional parameters of the Eighth Amendment on the part of defendant. It appears from the evidence before the court that Culpepper suffers from multiple serious medical conditions. Culpepper also suffers great pain due to these conditions. The record before the court is an extensive and detailed overview of his medical history as assessed by the medical staff while incarcerated beginning in January 2009, his serious medical conditions, and the care he received during his incarceration while under the

---

[2]To state a claim for inadequate medical care under 42 U.S.C. § 1983, a plaintiff must show deliberate indifference to his serious medical needs in violation of his Eighth Amendment right, if the individual is an incarcerated prisoner, and his Due Process rights, if the individual is a pretrial detainee. See Estelle v. Gamble, 429 U.S. 97 (1976). The standard under the Eighth Amendment and Due Process is the same.

9

care of defendant Broadwell. Plaintiff has continually been seen by medical professionals, evaluated, and treated for his serious medical conditions. His medical illnesses are recognized and treated with concern and attentiveness by all involved. There has been no delay and he has not been ignored by the medical staff as is reflected in the record. Any dispute as to the course of treatment is not cognizable under 42 U.S.C. § 1983. Russell, 528 at 319; see also Johnson v. Stephan, 6 F.3d 691, 692 (10th Cir. 1993); Davis v. Hall, 992 F.2d 151, 153 (8th Cir. 1993). Therefore, defendant Broadwell is cloaked with qualified immunity.

Accordingly, the motion for summary judgement is GRANTED. (D.E. # 28). Having so determined, the clerk is DIRECTED to close the case.

August 17, 2010.

TERRENCE W. BOYLE
United States District Judge